*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
GASTON, HOUTZ, and MYERS
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Anthony W. LEE**
Sergeant (E-5), U.S. Marine Corps
*Appellant*

**No. 202000239**

_____

Decided: 5 April 2022

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Michael D. Libretto (arraignment and motions)
Kyle G. Phillips (motions and trial)

Sentence adjudged 24 June 2020 by a special court-martial convened at Marine Corps Base Camp Lejeune, North Carolina, consisting of a military judge sitting alone. Sentence in the Entry of Judgment: reduction to paygrade E-1, confinement for 120 days, and a bad-conduct discharge.

For Appellant:
*Lieutenant Commander Megan P. Marinos, JAGC, USN*

For Appellee:
*Lieutenant Commander Jeffrey S. Marden, JAGC, USN*
*Lieutenant Gregory A. Rustico, JAGC, USN*

Judge HOUTZ delivered the opinion of the Court, in which Senior Judge GASTON and Judge MYERS joined.

---

**PUBLISHED OPINION OF THE COURT**

---

HOUTZ, Judge:

A military judge sitting as a general court-martial convicted Appellant, contrary to his pleas, of indecent conduct and adultery in violation of Article 134, Uniform Code of Military Justice [UCMJ].[1] Appellant asserts eight assignments of error [AOE], which we renumber as follows: (1) that the evidence for Specification 1 of the Charge (indecent conduct) is legally and factually insufficient; (2) that the evidence for Specification 2 of the Charge (adultery) is legally and factually insufficient; (3) that the offense of indecent conduct in Specification 1 of the Charge is preempted by Article 120b(c), UCMJ; (4) that the military judge erred when he denied the Defense motion to suppress evidence; (5) that the military judge erred when he ruled that the Defense was not entitled to certain evidence in discovery; (6) that the Entry of Judgment as written is deficient; (7) that the Government committed a discovery violation when it failed to provide the Defense with certain impeachment evidence in discovery; and (8) that the military judge effectively acquitted Appellant of Specification 1 of the Charge when he acquitted him of the word "persuade."

We find merit in Appellant's first AOE because the evidence for Specification 1 of the Charge is legally insufficient,[2] and we set aside the guilty finding and dismiss this specification. While we do not find merit in Appellant's second AOE, we do find merit in Appellant's fourth AOE, set aside the guilty finding for Specification 2 of the Charge, and authorize a rehearing for this specification. In light of these conclusions and action, we also set aside the sentence and do not reach the remaining AOEs.

---

[1] 10 U.S.C. § 934.

[2] Because we find the evidence legally insufficient to sustain this conviction, we do not reach the question of whether it is factually insufficient.

## I. BACKGROUND

In April 2019, Appellant responded to an advertisement posted on the website, "Doublelist."[3] The advertisement was posted by a user, "Watching Dad,"[4] and was entitled "Family fun (st aug)" with the description: "discreet males only. VERY open minded. hit me for details."[5] When Appellant responded to the advertisement, Watching Dad explained that his intention was to watch Appellant have sex with his girlfriend's 13-year-old daughter. Appellant indicated his interest in the offer and asked for a "clean photo" of the minor.[6] Appellant also asked Watching Dad whether the minor was actually interested and not being forced. After Watching Dad confirmed that no force was allowed, Appellant replied, "Hell I don't want anything to be forced. If she's down, id like to just make her happy."[7] Appellant described to Watching Dad the sexual acts he intended to engage in with the minor, including "p[***] eating, missionary, [and] letting her ride."[8] After first communicating via email, Appellant continued the conversation with Watching Dad by text message.

During the text-message exchange, Appellant voiced his concern that the situation might be a trap and asked Watching Dad if he could prove this was "legit."[9] Watching Dad sent Appellant a picture of what appears to be the clothed shoulder and breast of a female. Appellant asked, "Which area do you guys live in again?"[10] Watching Dad replied, "St aug."[11] Appellant then asked Watching Dad, "Forgive me. . . . One more question. What does her a[**] look like?"[12] Watching Dad did not immediately send a picture, but instead at-

---

[3] Doublelist is a website that is very similar to Craigslist, for personal advertisements. R. at 212. It came about shortly after the casual encounters section of Craigslist went away. *Id.* Doublelist advertises itself in part as the place for people who are straight, gay, bi, curious, etc. to be sexually free with no judgment. *Id.*

[4] R. at 481.

[5] Pros. Ex. 1, at 1.

[6] *Id.* at 2.

[7] *Id.* at 1.

[8] *Id.*

[9] Pros. Ex. 5, at 2.

[10] *Id.* at 3.

[11] *Id.*

[12] *Id.* at 4 (ellipses in original).

tempted to clarify whether Appellant was going to come over that night. Appellant said he was not available that night, but asked what Watching Dad's schedule was like the following day. Watching Dad asked, "8 good?" to which Appellant responded, "I'm good with whatever as long as she isn't forced and no one is being recorded or arrested."[13] Appellant then asked, "Does she know you're talking to me?"[14] Watching Dad told Appellant to text him the following day, then said, "she don't ask."[15] Appellant's final texts of the night asked, "Is she wearing panties? Right now?" and, after Watching Dad confirmed she was, "Can I see? Last request I promise I'll stop."[16] Watching Dad responded with a picture of what appears to be a young woman shown from the waist down, wearing only underwear. He told Appellant to contact him the following day around 6:00 p.m., but received no response.

The following day Appellant did not text Watching Dad. Instead, Watching Dad texted Appellant that evening, "Hey man you ready? We're home."[17] Appellant told Watching Dad that he was not interested. When Watching Dad asked Appellant, "Like not anymore even a different time?" Appellant explained:

> Like . . . I responded to several ads last night and received three responses. All of them were soliciting minors. I entertained the conversation because I was curious to see how far it would go, truthfully that many at one time can't be a coincidence. It's either a police sting or people are seriously messed up. Either way I'm not cool with it. It's your daughter man . . . .[18]

Watching Dad clarified, "Girlfriend daughter, but ok. Hit me back if you change mind. We're together a lot."[19] Appellant responded in what was his final text to Watching Dad, "Dude, look at it this way. I'm not down with the idea. But . . . I had multiple people approach me last night. If it was police activity

---

[13] *Id.* at 5.

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.* at 6.

[18] *Id.* at 7 (ellipses in original).

[19] *Id.* at 8.

might be something for you to think about."[20] Watching Dad thanked Appellant and the two did not communicate again.

Watching Dad was, in fact, Special Agent [SA] Mike[21] of the Federal Bureau of Investigation, acting as part of an undercover sting operation to apprehend child sex offenders. After Appellant's initial response to the advertisement, SA Mike began investigating Appellant's email address in an effort to determine Appellant's identity. After finding a similar email address on a Marine-affiliated website, SA Mike suspected Appellant may be associated with the Marine Corps and contacted the Naval Criminal Investigative Service [NCIS], which was able to link Appellant with the email address in question.

After identifying Appellant, NCIS contacted Appellant's wife, who signed a permissive authorization for search and seizure [PASS] for the cellular phone she shared with Appellant. Pursuant to the PASS, NCIS began its search of Appellant's cellular phone, but was only partially successful in attempting to download its contents. Two days later, Appellant and his wife revoked the PASS for the phone.

NCIS then obtained a Command Authorization for Search and Seizure [CASS] to search the phone for evidence of sexual crimes involving minors. During the search, SA Golf, NCIS, observed sexually explicit thumbnail images of what appeared to be an adult female with Appellant. SA Golf clicked on the images and confirmed that the female was not a minor. SA Golf then located additional thumbnail images in close proximity to the first images that appeared to be of the same adult female, including one of her in the uniform of a Marine captain. Upon seeing the additional images, SA Golf suspected Appellant was engaging in fraternization. Despite suspecting that the thumbnail image of the female in uniform was evidence of a crime not contemplated by the CASS, SA Golf did not stop to obtain a modification of the CASS. Instead, he clicked on the image to enlarge it, confirmed the female's rank, and included the enlarged image in his report, which was used to identify the female as Captain Roberts and led to other evidence that formed the basis for Appellant's conviction for adultery.

Prior to trial, Appellant moved to suppress the images of Captain Roberts and any evidence derived therefrom, arguing that SA Golf had exceeded the scope of the CASS when he clicked on the image of Captain Roberts in uniform

---

[20] *Id.* at 8 (ellipses in original).

[21] All names used in this opinion, other than those of Appellant, the judges, and counsel, are pseudonyms.

despite having already determined that she was an adult. The military judge agreed that SA had exceeded the scope of the CASS, finding that when SA Golf decided to click on the image "it would have been unreasonable for him to believe that it was in any way evidence of an offense which SA [Golf] was authorized to search for."[22] The military judge further found that neither the plain view exception nor the good faith exception applied in these circumstances, since the identity of Captain Roberts was not apparent from the thumbnail image of her in uniform and SA Golf knew that in clicking on the image to enlarge he was investigating "a separate (and 'superfluous') offense" that was beyond the scope of the CASS.[23] Nonetheless, the military judge found that under the balancing test of Military Rule of Evidence [Mil. R. Evid.] 311(a)(3), the benefits of suppressing the evidence were outweighed by "the cost of exclusion—the inability of the government to independently identify Captain [Roberts] and prosecute the offense"—and on that basis denied Appellant's motion to suppress.[24]

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant asserts the evidence is legally and factually insufficient to support his convictions. We review such questions de novo.[25]

To determine legal sufficiency, we ask whether, "considering the evidence in the light most favorable to the prosecution, a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt."[26] In conducting this analysis, we must "draw every reasonable inference from the evidence of record in favor of the prosecution."[27]

---

[22] App. Ex. XXXV, at 10.

[23] *Id.* at 10–11.

[24] *Id.* at 12–13.

[25] Article 66(d)(1), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

[26] *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

[27] *United States v. Gutierrez*, 74 M.J. 61, 65 (C.A.A.F. 2015) (citation and internal quotation marks omitted).

In evaluating factual sufficiency, we determine "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we] are . . . convinced of the [appellant's] guilt beyond a reasonable doubt."[28] In conducting this unique appellate function, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt."[29] Proof beyond a "[r]easonable doubt, however, does not mean the evidence must be free from conflict."[30]

*1. Attempted Indecent Conduct*

The general elements of the offense of indecent conduct are: (1) that Appellant engaged in certain conduct; (2) that the conduct was indecent; and (3) that, under the circumstances, the conduct was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces, or both.[31] However, in this case the offense of which Appellant was convicted in Specification 1 of the Charge alleges that he *attempted* to induce and entice a minor to engage in sexual activity.[32] Specifically, as excepted and substituted in the military judge's guilty finding, the charge states:

> In that Sergeant Anthony W. Lee, United States Marine Corps, on active duty, did, at or near Jacksonville, Florida, on or about 1 July 2019, commit indecent conduct, to wit: attempting to induce, entice, one minor to engage in sexual activity with the said Sergeant Lee, and that said conduct was of a nature to bring discredit upon the armed forces.[33]

---

[28] *Turner*, 25 M.J. at 325.

[29] *Washington*, 57 M.J. at 399.

[30] *United States v. Rankin,* 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006).

[31] *Manual for Courts-Martial, United States* (2019 ed.) [*MCM* (2019)], pt. IV, ¶ 104.b. "'Indecent' means that form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and tends to excite sexual desire or deprave morals with respect to sexual relations." *MCM*, pt. IV, ¶ 104.c.(1).

[32] App. Ex. XL, at 2.

[33] *Id.*

a. Elements

Appellant contends that although the charge is drafted as a violation of Article 134, UCMJ, the use of the word "attempt" in the specification requires the Government to prove the elements of attempt under Article 80, UCMJ. Those elements are: "(1) That the accused did a certain overt act; (2) That the act was done with the specific intent to commit a certain offense under the UCMJ; (3) That the act amounted to more than mere preparation; and (4) That the act apparently tended to effect the commission of the intended offense."[34] "To constitute an attempt there must be a specific intent to commit the offense accompanied by an overt act which directly tends to accomplish the unlawful purpose."[35] Thus, the offense requires proof that Appellant committed an overt act with the intent to commit all the elements of indecent conduct.

The Government responds that Appellant "mistakenly conflates Articles 80 and 134" and argues that it must only prove the indecent conduct. According to the Government, "That the conduct in question was Appellant's *attempt* to induce or entice a thirteen-year-old child to engage in sexual activity with him does not change the nature—or elements—of the offense."[36] The Government would have us conclude that, because Appellant was charged under Article 134 instead of Article 80, it was not required to prove that Appellant committed any overt act that was a substantial step toward inducing or enticing a minor to engage in sexual activity with him.

We do not find the Government's attempt to avoid the burden of proving an overt act persuasive for a number of reasons. First, the Government's argument on appeal ignores concessions already made at trial. In its response to Appellant's motion for a finding of not guilty of this offense under Rule for Courts-Martial [R.C.M.] 917, the Government did not argue that it was not required to prove an overt act, but instead argued that "the substantial step for an attempt can be satisfied by words alone."[37] Allowing the Government "to tell the military judge one thing . . . and then . . . assert something else on appeal . . . would go against the general prohibition against taking inconsistent litigation positions."[38]

---

[34] *MCM* (2019), pt. IV, ¶ 4.b.

[35] *Id.* at pt. IV, ¶ 4.c.(1).

[36] Govt. Br. at 34 (emphasis added).

[37] R. 464–65.

[38] *United States v. Schmidt*, ___ M.J. ___, No. 21-0004, 2022 CAAF LEXIS 139, at *32-33 (C.A.A.F. Feb. 11, 2022) (Maggs, J., concurring) (citing 18B Charles Alan

Second, when an accused is charged with attempting certain behavior that would constitute a criminal offense if completed, the requirement of proving an overt act "ensures that mere thought crimes are not prosecuted."[39] That is why "[t]he overt act required goes beyond preparatory steps and is a direct movement toward the commission of the offense."[40] "Accordingly, the substantial step must unequivocally demonstrate that the crime will take place unless interrupted by independent circumstances."[41] Courts must be cautious about "treating speech (even obscene speech) as the 'substantial step' because it would abolish any requirement of a substantial step."[42]

Finally, as both this Court and our superior court have previously found, "an attempted enticement offense charged under Article 134, UCMJ, . . . must incorporate some of the elements that would have been present had an Article 80, UCMJ, offense been alleged."[43] These elements include that "(1) the accused specifically intended to commit the substantive offense; and (2) that the accused took a substantial step toward persuading, inducing, or enticing a minor to engage in illegal sexual activity."[44] While the military judge did not issue special findings, it appears based on his written denial of the Defense R.C.M. 917 motion that he did not consider a substantial step to be a required element of Specification 1 of the Charge.[45] We find this to be an erroneous view of the law under the controlling case precedent.[46]

---

Wright et al., *Federal Practice and Procedure* § 4477 (2d ed. 1992 & Supp. 2021) ("Absent any good explanation, a party should not be allowed to gain an advantage by litigating on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory.").

[39] *United States v. Schell*, 72 M.J. 339, 344 (C.A.A.F. 2013).

[40] *MCM* (2019), pt. IV, ¶ 4.c.(2).

[41] *United States v. Winckelmann*, 70 M.J. 403, 407 (C.A.A.F. 2011) (internal punctuation and citation omitted).

[42] *Id.* at 407 (quoting *United States v. Gladish*, 536 F.3d 646, 650 (7th Cir. 2008) (internal punctuation and citation omitted)).

[43] *United States v. Hoffmann*, No. 201400067, 2020 CCA LEXIS 198, *17 (N-M Ct. Crim. App. June 10, 2020) (unpublished) (citing *Schell*, 72 M.J. 339).

[44] *Id.* at *17 (quoting *Schell*, 72 M.J. at 345-46) (internal punctuation omitted).

[45] *See* App. Ex. XLII.

[46] *See Schell*, 72 M.J. at 346 (setting aside a guilty plea to attempting to persuade, induce or entice a minor to engage in sexual activity in violation of Article 134, UCMJ, where the military judge failed to inform the accused of the "substantial step" element);

b. Substantial Step Analysis

Assuming the military judge correctly understood the elements required for this offense, the Government argues here, as it did at trial, that words alone can be enough to prove an overt act. Our superior court explained in *United States v. Winckelmann* that "online dialogue must be analyzed to distinguish 'hot air' and nebulous comments from more concrete conversation that might include making arrangements for meeting the (supposed) minor, agreeing on a time and place for a meeting, making a hotel reservation, purchasing a gift, or traveling to a rendezvous point."[47] Even where travel is not involved, a course of conduct that constitutes "grooming" the victim can suffice to prove a substantial step.[48]

This case contains no evidence of any of these things. There is no evidence that Appellant attempted to make a hotel reservation, purchase a gift, purchase condoms, travel to a rendezvous point, or even obtain a physical address. Unlike the appellant in *Winckelmann*, Appellant never communicated, directly or indirectly, with a minor, either real or purported. There is no evidence that Appellant engaged in any acts that could be characterized as an overt act or substantial step other than his online conversations. When we analyze the online conversations to determine whether any constitute the sort of "concrete

---

*United States v. Brooks*, 60 M.J. 495, 498–99 (C.A.A.F. 2005) (discussing "the issue of intent and the substantial step necessary" for a charge of attempting to persuade, induce, and entice a minor to engage in illegal sexual activity).

[47] *Winckelmann*, 70 M.J. at 407-08 (quoting *United States v. Zawada*, 552 F.3d 531, 534-35 (7th Cir. 2008) (internal quotations omitted); *see also United States v. Nestor*, 574 F.3d 159, 161 (3rd Cir. 2009) (posting an advertisement online seeking sexual contact with children, repeatedly discussing such activity with an adult intermediary, arranging a rendezvous for the sexual encounter, and discussing ways to avoid police detection "constitute[d] a substantial step."); *United States v. Thomas*, 410 F.3d 1235, 1246 (10th Cir. 2005) ("Thomas crossed the line for 'harmless banter' to inducement the moment he began making arrangements to meet [the victim].").

[48] *See Winckelmann*, 70 M.J. at 408 ("Where an accused has not traveled to a rendezvous point and not engaged in such 'concrete conversation,' courts have nonetheless found that defendants have taken a substantial step toward enticement of a minor where there is a course of more nebulous conduct, characterized as 'grooming' the victim.") (citing *United States v. Goetzke*, 494 F.3d 1231, 1236 (9th Cir. 2007) (finding a substantial step when the defendant mailed letters that "flattered" a minor, "described sex acts," and "encouraged" the victim to visit him again); *United States v. Bailey*, 228 F.3d 637, 639 (6th Cir. 2000) (affirming a § 2422(b) conviction where the defendant repeatedly "contacted" a minor, "urged her to meet him, and used graphic language to describe how he wanted to perform oral sex on her")).

conversation" required under *Winckelmann*, we conclude that the dialog between Appellant and Watching Dad never rose to more that "hot air."

The Government relies on *United States v. Nestor*[49] to argue that Appellant's conversation with Watching Dad constituted a substantial step. In *Nestor*, the accused posted an online advertisement seeking sexual contact with children; engaged in repeated conversation with a man who responded to his ad, discussing having sexual contact with children; arranged a rendezvous for the sexual encounter; and discussed ways to avoid police detection.[50] The Third Circuit Court of Appeals held that "[i]ndividually, each of these actions *could* constitute a substantial step . . . [and] when examined together, there is no question that Nestor . . . [took] a substantial step towards persuading, inducing, enticing, or coercing a child to engage in sexual activity."[51]

Appellant's case is distinguishable from *Nestor*. Unlike the evidence presented in *Nestor*, the evidence presented in this case shows only that Appellant engaged Watching Dad in a conversation, albeit an obscene one. Appellant did not himself post an advertisement seeking sexual contact with minors, though he did respond to Watching Dad's advertisement for "family fun." Despite Watching Dad's attempts to have Appellant arrange a meeting, Appellant avoided making any specific plans or commitments, and no location or time for a rendezvous was ever agreed upon. When Watching Dad texted Appellant the following day to continue the conversation, Appellant unequivocally stated he was not interested in sexual activity with the minor in question. While Appellant did express his concern this might be a police trap, he did not "discuss ways to avoid police detection."[52]

In our view, the evidence presented in this case is "simply too preliminary to constitute a substantial step."[53] We conclude that, even in the light most favorable to the Prosecution, the evidence is insufficient for a reasonable fact-finder to have found all the legally required elements beyond a reasonable doubt. We therefore find the evidence legally insufficient to support Appellant's conviction. We take action in our decretal paragraph.

---

[49] 574 F.3d 159 (3rd Cir. 2009).

[50] *Id. at* 161.

[51] *Id.* (emphasis added).

[52] *Id.*

[53] *Winckelmann*, 70 M.J. at 408 (internal quotation omitted).

*2. Adultery*

The elements of adultery are: (1) that Appellant had sexual intercourse with a certain person; (2) that, at the time, Appellant or the other person was married; and (3) that, under the circumstances, the conduct of Appellant was to the prejudice or good order and discipline or was of a nature to bring discredit upon the armed forces.[54]

Appellant does not dispute that he had a sexual relationship with Captain Roberts while he was married to another person. He does, however, argue that the Government failed to prove that his conduct was prejudicial to good order and discipline or service discrediting.

Having reviewed the entire record in this case, we find that the evidence presented at trial was sufficient to find Appellant guilty of adultery beyond a reasonable doubt. Thus, Appellant's argument that the evidence was legally and factually insufficient to support his conviction for adultery lacks merit. However, because we find that much of the critical evidence presented against Appellant relevant to this finding was the result of an unreasonable search and should have been suppressed, we refrain from commenting on the specific strengths and weaknesses of the Government's case.

**B. Motion to Suppress**

Appellant argues that the military judge abused his discretion when he denied Appellant's motion to suppress the photos and identification of Captain Roberts and other evidence obtained by the search of his cellular phone. We review a military judge's ruling on a motion to suppress evidence for abuse of discretion and consider the evidence in the light most favorable to the party that prevailed on the motion.[55] A military judge abuses his discretion if the findings of fact upon which he predicates his ruling are not supported by the evidence in the record, if he uses incorrect legal principles, or if he applies the legal principles to the facts in a way that is clearly unreasonable.[56] The decision must be "arbitrary, fanciful, clearly unreasonable or clearly erroneous."[57]

The Fourth Amendment provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

---

[54] *Manual for Courts-Martial, United States* (2016 ed.) [*MCM* (2016)], pt. IV, ¶ 62.b.

[55] *United States v. Blackburn*, 80 M.J. 205, 210–11 (C.A.A.F. 2020).

[56] *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010).

[57] *United States v. Sullivan*, 74 M.J. 448 (C.A.A.F. 2015) (citation omitted).

seizures, shall not be violated; and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized."[58] A search conducted pursuant to a warrant or search authorization is presumptively reasonable.[59] However, search authorizations must "describe the things to be seized with sufficient particularity to prevent a general exploratory rummaging in a person's belongings."[60] As the Supreme Court has explained, "[b]y limiting the authorization to search to the specific areas and things for which there is probable cause to search, the [particularity] requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit."[61] As an exception to the warrant requirement, "evidence of a search conducted without probable cause is admissible if conducted with lawful consent."[62]

Data stored within a cell phone falls within the Fourth Amendment's protection. Such devices present "distinct issues," and "[t]he prohibition of general searches is not to be confused with a demand for precise ex ante knowledge of the location and content of evidence."[63] Given "the dangers of too narrowly limiting where investigators can go," such searches may be properly limited "to evidence of specific federal crimes or specific types of material" without necessarily "requir[ing] particular search methods and protocols."[64] However, such searches remain subject to an "ex post reasonableness analysis" to assess whether they have struck the appropriate balance between being "expansive enough to allow investigators access to places where incriminating materials may be hidden, yet not so broad that they become the sort of free-for-all general searches the Fourth Amendment was designed to prevent."[65]

---

[58] U.S. Const. amend. IV.

[59] *See United States v. Wicks*, 73 M.J. 93, 99 (C.A.A.F. 2014) (citing *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967)).

[60] *United States v. Richards*, 76 M.J. 365, 369 (C.A.A.F. 2017) (quoting *United States v. Carey*, 172 F.3d 1268, 1272 (10th Cir. 1999)).

[61] *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).

[62] *Wicks*, 73 M.J. at 99.

[63] *Richards*, 76 M.J. at 369–70 (citation omitted).

[64] *Id*. at 370 (citation omitted).

[65] *Id*. (citations omitted).

Evidence obtained as a result of an unlawful search or seizure is generally inadmissible against an accused if:

> (1) the accused makes a timely motion to suppress or an objection to the evidence . . .

> (2) the accused had a reasonable expectation of privacy in the person, place, or property searched; . . . or the accused would otherwise have grounds to object to the search or seizure under the Constitution of the United States as applied to members of the Armed Forces; and

> (3) exclusion of the evidence results in appreciable deterrence of future unlawful searches or seizures and the benefits of such deterrence outweigh the costs to the justice system.[66]

Once the defense makes an appropriate motion or objection, the prosecution bears the burden of proving the evidence was lawfully obtained.[67] "Evidence derivative of an unlawful search, seizure, or interrogation is commonly referred to as the 'fruit of the poisonous tree' and is generally not admissible at trial."[68]

"The exclusionary rule is not an individual right and applies only where it results in appreciable deterrence."[69] Rather than applying the exclusionary rule automatically, the Supreme Court has "focused on the efficacy of the rule in deterring Fourth Amendment violations in the future."[70] As the Court explained in *Herring v. United States*,

> [t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.[71]

---

[66] Mil. R. Evid. 311(a).

[67] Mil. R. Evid. 311(d)(5)(A).

[68] *United States v. Conklin*, 63 M.J. 333, 334 (C.A.A.F. 2006).

[69] *Herring v. United States*, 555 U.S. 135, 141 (2009).

[70] *Id.*

[71] *Id.* at 144.

The primary costs of exclusion are letting the guilty party go free, as well as the toll upon truth-seeking and law enforcement objectives.[72] "The extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct."[73] "Evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment."[74] This understanding of the Fourth Amendment is the basis for the exceptions to the warrant requirement, such as good faith and inevitable discovery.[75]

In this case, Appellant made a timely motion to suppress the photographs of Captain Roberts found during the search of his cellular phone. The military judge made detailed findings of fact, including the following specifically relevant to our analysis here:

> On 29 April 2019, the accused's wife granted a permissive authorization for search and seizure (PASS) of a cellular phone jointly used by her and the accused which was associated with the phone number suspected to be utilized to send text messages charged in Specification 1 of Charge I. There was no express or implied limitations placed on the PASS.[76]

> On 1 May 2019, the accused and his wife revoked the PASS for the cellular phone.[77]

> On 1 May 2019, SA [Golf] received a command authorized search and seizure (CASS) for the cell phone. The CASS permitted law enforcement agents to search the cellular device for evidence that relates to violations of Articles 120B (sexual abuse of a child), 134 (child pornography), 82 (soliciting commission of offenses), and 80 (attempts); and Title 18 U.S.C. 2256 (child pornography); Title 18 U.S.C. 2422 (coercion and enticement); Title U.S.C. 2423 (Transportation of minors), Title 18 U.S.C. 2425 (using interstate facilities to transmit details about a minor), and

---

[72] *Id.* at 141.

[73] *Id.* at 143.

[74] *Id.* (internal quotation and citation omitted).

[75] Mil. R. Evid. 311(c)(2)–(3).

[76] App. Ex. XXXV, at 1.

[77] *Id.* at 2.

Florida Statute 847.0315 (computer pornography, prohibited computer usage, travelling to meet a minor).[78]

During a manual review of the image files located on the phone, SA [Golf] observed images of a female he later learned to be Captain [Roberts], USMC. These first photos of Captain [Roberts] that SA [Golf] found did not attribute any military status to her (i.e. none were in uniform). They were of her alone or with the accused and some of them were sexual in nature.[79]

SA [Golf] reviewed the image files on the screen in a gallery format which displayed between 12 and 16 thumbnail images on the screen at a time. When SA [Golf] first located the sexually explicit images of Captain [Roberts] he clicked on the thumbnail images to enlarge them to determine whether the person was a minor or an adult. SA [Golf] quickly concluded that the person who he later learned was Captain [Roberts] was an adult.[80]

All of the photographs containing Captain [Roberts] were located in close proximity to one another within the gallery display on the cellular phone.[81]

SA [Golf] could not remember when he first observed the photographs of Captain [Roberts] or whether it was before the time the PASS was revoked or after the CASS was signed.[82]

SA [Golf] did not take any notes of when the images depicting Captain [Roberts] were first located because they were "superfluous" to the offenses he was investigating.[83]

---

[78] *Id.*

[79] *Id.*

[80] *Id.* at 3.

[81] *Id.*

[82] *Id.*

[83] *Id.* at 4.

When SA [Golf] observed the thumbnail image depicting
Captain [Roberts] in uniform he believed the person looked sim-
ilar to the person he had already observed in the sexually ex-
plicit images and with the accused.[84]

Upon seeing the thumbnail image of Captain [Roberts] in
uniform, SA [Golf] suspected the accused had engaged in frater-
nization with her because he believed it was the same person he
saw in the other sexually explicit photos and with the accused
and because he could see her rank on her uniform.[85]

Despite suspecting that the thumbnail image of Captain
[Roberts] in uniform was evidence of a crime not contemplated
by the search authorization, SA [Golf] did not stop his search to
seek a new authorization before clicking on the image to enlarge
it.[86]

Before identifying Captain [Roberts] by way of the picture of
her in uniform, neither SA [Golf] nor any other government
agent had suspected the accused of committing an offense unre-
lated to those identified within the search authorization.[87]

We find that these findings of fact are supported by the record in this case.

The military judge concluded that SA Golf's actions in clicking on, enlarg-
ing, searching, and seizing the photographs of Captain Roberts depicted in her
uniform were unreasonable.[88] He explained that his "conclusion [was] based
on: (1) SA [Golf's] belief that the female in uniform was the same person he
saw in the other images and (2) SA [Golf's] previous determination that the
person in the other images was an adult."[89] The military judge further ex-
plained that "when SA [Golf] enlarged the thumbnail image it would have been
unreasonable for him to believe that it was in any way evidence of an offense

---

[84] *Id.*

[85] *Id.*

[86] *Id.*

[87] *Id.*

[88] *Id.* at 9–10.

[89] *Id.* at 10.

which SA [Golf] was authorized to search for. In fact, SA [Golf] testified that he believed the image may be evidence of a wholly separate offense."[90]

### 1. The "Plain View" Exception

Evidence falling outside the scope of a warrant or search authorization may be seized if "[t]he person while in the course of otherwise lawful activity observes in a reasonable fashion property or evidence that the person has probable cause to seize."[91] As the military judge correctly explained, in order for this plain view exception to apply "(1) the officer must not violate the Fourth Amendment in arriving at the spot from which the incriminating materials can be plainly viewed; (2) the incriminating character of the materials must be immediately apparent; and (3) the officer must have lawful access to the object itself."[92]

Here, the military judge determined that enlarging and seizing the image of Captain Roberts in uniform was did not fall within the plain view exception, because, "by SA [Golf's] own admission, the incriminating character of the image was not 'immediately and plainly apparent' when he viewed the thumbnail image in gallery view along with 12 to 16 other images on the page."[93] In examining the issue, the military judge first noted that the CASS permitted SA Golf to search through the image files on the phone in order to look for evidence of the suspected offenses relating to minors. He then engaged in an "ex post reasonableness analysis" in analyzing the actual actions taken by SA Golf.[94] In doing so, he concluded that it was unreasonable for SA Golf to "click on, enlarge, search, and seize the photograph of Capt [Roberts] depicted in her uniform."[95] The military judge based his conclusion on "(1) SA [Golf's] belief that the female in uniform was the same person he saw in the other images and (2) SA [Golf's] previous determination that the person he saw in the other images was an adult."[96]

---

[90] *Id.*

[91] Mil. R. Evid. 316(c)(5)(C).

[92] App. Ex. XXXV, at 8 (citing *Richards*, 76 M.J. at 371).

[93] App. Ex. XXXV, at 10.

[94] *Id.* at 7, 9–10 (citing *Richards*, 76 M.J. at 370).

[95] App. Ex. XXXV, at 9–10.

[96] *Id.* at 10.

The Supreme Court has noted that the "distinction between looking at a suspicious object in plain view and moving it even a few inches is much more than trivial for the purposes of the Fourth Amendment."[97] The military judge's conclusion that clicking on and enlarging a thumbnail image is a meaningful distinction under the plain view analysis is in accordance with *United States v. Osorio*, in which our sister court found that an agent's action of opening thumbnail images is similar to moving an object for Fourth Amendment purposes.[98] We agree with this view. While the agent's observation of the thumbnail image, which was in plain view during a valid search, could potentially serve as a basis to obtain a new search authorization, the enlargement of the image itself must be consistent with the existing authorization in order to ensure that the Fourth Amendment's prohibition of general warrants is not violated.[99]

In this case, the military judge correctly concluded that SA Golf's action of clicking on and enlarging the initial images of Captain Roberts that were of a sexual nature was consistent with the CASS, since this was done to ascertain whether or not the images depicted a minor. The military judge also correctly concluded that SA Golf's action of clicking on and enlarging later images of Captain Roberts that were nonsexual in nature constituted a search for evidence not authorized by the CASS, because by that time SA Golf knew she was not a minor and it was not immediately apparent that those photographs, including that of Captain Roberts in uniform, constituted evidence of a crime. And he correctly found that "SA [Golf] did not rely on the terms of the warrant because he acknowledged that although he suspected that the accused had

---

[97] *Arizona v. Hicks*, 480 U.S. 321, 325 (1987).

[98] *United States v. Osorio*, 66 M.J. 632, 637 (A.F. Ct. Crim. App. 2008); *cf. United States v. Washington*, No. ARMY MISC 20100961, 2011 CCA LEXIS 18 (Army Ct. Crim. App. Feb. 8, 2011) (unpublished) (finding agent's seizure of child pornography during authorized search of suspect's computer for images of alleged victim was consistent with the plain view exception because it was immediately apparent that the videos in question contained child pornography and were therefore subject to seizure and subsequent analysis without a separate warrant.).

[99] *See Richards*, 76 M.J. at 371 (finding that when agent discovered child pornography during authorized search of the appellant's digital media, "he properly stopped his search and obtained a new authorization that allowed him to search specifically for child pornography"); *Osorio*, 66 M.J. at 637 (holding that practitioners must "comply with [the] specificity [of the warrant or search authorization] and then, if they come across evidence of a different crime, stop their search and seek a new authorization.").

committed fraternization before clicking on and enlarging the thumbnail image, he admitted it was a separate (and 'superfluous') offense other than those which he was investigating or which was contemplated by the search authorization."[100]

### 2. The Cost/Benefit Analysis of Exclusion

Nonetheless, the military judge denied Appellant's motion to suppress, finding "that the deterrence benefits of suppression do not outweigh its heavy cost." The military judge based his conclusion on four factors:

> (1) despite exceeding the scope of the search authorization, SA [Golf] was lawfully in the location where the picture of Captain [Roberts] in her uniform was discovered (i.e. looking through images pursuant to a lawful search authorization in search of child pornography), (2) SA [Golf] did not conduct additional searches for evidence related to the accused's relationship with Captain [Roberts] because he considered it to be 'superfluous' to the intended object of his search activities, (3) SA [Golf] recognized that the female in uniform was likely the same person depicted in the intimate pictures of the accused even before enlarging and capturing the photo, and (4) intimate images of Capt [Roberts] with the accused were lawfully viewed in plain view and within the scope of the search authorization before the unlawful search occurred.[101]

The military judge ruled that "[b]ased on those circumstances the Court finds the deterrent effect of excluding the evidence to be minimal and the cost of exclusion—the inability of the government to independently identify Captain [Roberts] and prosecute the offense—to be high."[102]

While we agree with the military judge's conclusion that SA Golf's actions constituted an unreasonable search, which the Government does not dispute,

---

[100] App. Ex. XXXV, at 11. The military judge also properly concluded that the exception for good faith reliance on a search authorization did not apply, since once SA Golf determined that Captain Roberts was not a minor, he was intentionally *not* relying on the CASS to enlarge and seize the additional images of her, for which the trial counsel conceded there was "no independent source or inevitable discovery." R. at 123–24.

[101] App. Ex. XXXV, at 12–13.

[102] *Id*. at 13.

we find that in balancing the benefits of deterring future unreasonable searches against the costs to the justice system, the military judge applied "the legal principles to the facts in a way that is clearly unreasonable."[103] The Government argues the military judge correctly admitted the evidence because SA Golf's actions amounted to "simple negligence," making "the deterrent effect of the exclusion minimal while the cost was high."[104] Although we recognize that SA Golf's conduct may not have been as flagrant a violation of the Fourth Amendment as those found in the cases cited by the Government, the question is not whether the search could have been *more* unreasonable, but whether (1) exclusion of the evidence results in appreciable deterrence of future unlawful searches or seizures and (2) the benefits of such deterrence outweigh the costs to the justice system.

In this case, contrary to the Government's claims, SA Golf's actions went beyond mere negligence. As the military judge himself found, "SA [Golf] . . . acknowledged that although he suspected that the accused had committed fraternization before clicking on and enlarging the thumbnail image of Capt Roberts in uniform, he admitted it was a separate (and 'superfluous') offense other than those which he was investigating or which was contemplated by the search authorization."[105] While the test for "deterrence and culpability is objective, not an inquiry into the subjective awareness" of law enforcement, we find that "a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances."[106] Here, SA Golf's decision to investigate Appellant for an unrelated offense was an intentional violation of the limits that he knew were contained in the CASS. This is exactly the sort of law enforcement conduct that is "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."[107]

Allowing Appellant to avoid an adultery conviction is clearly not too high a price to deter law enforcement agents from pursuing a particular line of investigation where, as here, they fully realize that if they continue they will go beyond the scope of their search authorization. Indeed, such deterrence in this case means simply requiring law enforcement agents to do what they already

---

[103] *Ellis*, 68 M.J. at 344.

[104] Appellee's Br. at 46 (internal quotation omitted).

[105] App. Ex. XXXV, at 11.

[106] *Herring*, 555 U.S. at 145 (internal citations and quotations omitted).

[107] *Id*. at 144.

know they are supposed to be doing: obtain additional authorization to continue the search before proceeding past the limits of a CASS. If we were to allow the use of evidence seized in such knowing violation of the Fourth Amendment's particularity requirement, not only would we be fostering the sort of "wide-ranging exploratory searches the Framers intended to prohibit,"[108] but "the protection of the Fourth Amendment declaring [a person's] right to be secure against such searches and seizures [would be] of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution."[109] And it would essentially allow the balancing test to become an end-run around the limits of the plain view doctrine, which already, as our superior court has noted, "in a digital context poses a serious risk that every warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant."[110] Hence, while we find his thorough, written ruling to be cogent in every other respect, based on the facts of this particular case, we find the military judge clearly erred in finding that the cost of exclusion to the justice system outweighs the benefits of deterring future unlawful searches or seizures.

### 3. Prejudice

Having found error, we test for prejudice. "A constitutional error is harmless when it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," meaning the error was "unimportant in relation to everything else the [trier of fact] considered on the issue in question."[111]

We find that the error of admitting the photographs of Captain Roberts and other evidence derived from them is not harmless beyond a reasonable doubt. As the military judge pointed out in his ruling, "[b]efore identifying Captain [Roberts] by way of the picture of her in uniform, neither SA [Golf] nor any other government agent had suspected the accused of committing an offense

---

[108] *Garrison*, 480 U.S. at 84.

[109] *Mapp v. Ohio*, 367 U.S. 643, 648 (1961) (quoting *Weeks v. United States*, 232 U.S. 383, 393 (1914)).

[110] *United States v. Gurczynski*, 76 M.J. 381, 387 (C.A.A.F. 2017) (citations and internal quotation marks omitted).

[111] *United States v. Hoffmann*, 75 M.J. 120, 128 (C.A.A.F. 2016) (citation and internal quotation marks omitted); see also Article 59(a), UCMJ (requiring error that "materially prejudices the substantial rights of the accused.").

unrelated to those identified within the search authorization."[112] We agree with the military judge that absent SA Golf's unlawfully clicking on the photograph in question to enlarge it for further investigation, the Government would have been unable "to independently identify Captain [Roberts] and prosecute the offense."[113] Given the derivative nature of the other evidence for this offense, we find the unlawfully obtained evidence constituted an essential part of the evidence against Appellant and was not "unimportant in relation to everything else the [military judge] considered on the issue in question."[114]

Accordingly, we conclude that Appellant's conviction for adultery must be set aside, and take such action in our decretal paragraph below.

## III. CONCLUSION

The findings and sentence are **SET ASIDE**. Specification 1 of the Charge is **DISMISSED WITH PREJUDICE**. A rehearing is authorized for Specification 2 of the Charge. This case is remanded to the Judge Advocate General for further proceedings not inconsistent with this opinion.

Senior Judge GASTON and Judge MYERS concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court

---

[112] App. Ex. XXXV, at 4.

[113] *Id*. at 13.

[114] *Hoffmann*, 75 M.J. at 128 (citation and internal quotation marks omitted); *see also* Article 59(a), UCMJ (requiring error that "materially prejudices the substantial rights of the accused.").